IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| BRIAN M. SNOW, <br> AIS #228680, <br>     Plaintiff, <br><br> v. <br><br> LT. HINES, *et al.*, <br><br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )    CASE NO. 2:17-CV-149-RAH-SRW <br> )                  (WO) <br> ) <br> ) <br> ) <br> ) |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

### I.  INTRODUCTION

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Brian M. Snow, a convicted state inmate, challenging the constitutionality of defendant officers Derrick Hines and Cedric Weathers' actions in January 2017 during his confinement at the Staton Correctional Facility.  On March 12, 2020, the court entered an order which (1) granted the defendants' motion for summary judgment as to the plaintiff's claims seeking monetary damages from the defendants in their official capacities; (2) granted the defendants' motion for summary judgment on behalf of defendants Crow and Howard, in their individual capacities, on the excessive force and failure to protect claims; (3) denied the defendants' motion for summary judgment on behalf of defendants Weathers and Hines, in their individual capacities, on the excessive force and failure to protect claims; and (4) referred the case to the Magistrate Judge for an evidentiary hearing on the plaintiff's surviving excessive force and failure to protect claims against defendants Weathers and Hines for monetary damages in their individual capacities. (Doc. 39). In accordance with this order, the undersigned Magistrate Judge conducted an evidentiary hearing on August 26, 2020; November

1

10, 2020; and December 15, 2020, with respect to Snow's excessive force and failure to protect claims.[1] *See* 28 U.S.C. § 636(b)(1)(B). After duly considering all relevant testimony and exhibits placed into evidence during the hearing, the Magistrate Judge concludes that judgment should be entered in favor of the defendants.

## II.  EVIDENTIARY HEARING - TESTIMONY AND EVIDENCE

The evidentiary hearing proceeded on the question of whether defendant officers Hines and Weathers forced the plaintiff to fight inmate Lawson on January 5, 2017, resulting in the plaintiff's shoulder injury. The plaintiff raises two constitutional claims: (1) that defendants violated his Eighth Amendment right to be free from excessive force, and (2) that defendants failed to protect him from harm when they compelled him to fight in violation of the Eighth Amendment.

To establish his claims, Snow relies on his own testimony and the testimony of another inmate, Willie Robinson, who did not witness the alleged fight. Officers Hines and Weathers each provided testimony in opposition to Snow's claims. Also, Captain Ronzella Howard testified concerning Snow's report to her on January 11th about the January 5th incident and subsequent events, and her actions and investigations based on this report. Kelly Rice, the nurse who examined Snow immediately after the alleged assault, also testified regarding his shoulder injury and the absence of any significant additional injuries to Snow. Dr. Michael Borowicz, an ADOC physician, testified based upon his review of Snow's medical documents and offered medical opinions about the prognosis for Snow's shoulder injury.

In addition, the court admitted the following exhibits into evidence: January 5, 2017 Incident Report (Ex. 1, Bates 686); Amended Incident Report signed January 30, 2017 (Ex. 2, Bates 687); Brian Snow's Body Chart dated January 5, 2017 (Ex. 3, Bates 688); Inmate Willie

---

[1] The parties did not file a jury demand.

Robinson's handwritten statement dated January 5, 2017 (Ex. 4, Bates 689); Former Inmate John Hunter's handwritten statement dated January 5, 2017 (Ex. 5, Bates 690); Inmate Snow's handwritten statement dated January 11, 2017 (Ex. 6, Bates 691); Inmate Patrick Lawson's handwritten statement (Ex.7, Bates 692); Photos of Brian Snow from January 5, 2017 (Ex. 8, Bates 693-695); Living Agreement Dated January 5, 2017 signed by inmates Brian Snow and Patrick Lawson (Ex. 9, Bates 696); Portions of Brian Snow's medical Records (Ex. 10)[2]; Officer Cedric Weathers' typed and signed statement (Ex. 11, Bates 697); Officer Derrick Hines' typed and signed statement (Ex. 12, Bates 698); and Brian Snow's Movement History Form (Ex. 13, Bates 700). The court closely observed the witnesses during their testimony and has undertaken a thorough review of the evidence presented by the parties, including the testimony and exhibits, presented at the evidentiary hearing.

According to Snow's sworn testimony, around 1:00 a.m. on January 5, 2017, he got into a verbal argument in the dorm over a cigarette with inmate Lawson, whom he characterized as a "real aggressive inmate." Officer Weathers saw the argument and reported it to officer Hines. At Hines' request, Weathers escorted Snow to see Hines on the "black top" outside the shift office. Snow said Hines told him that Lawson had reported that Snow had hit Lawson when he was not looking. Snow also said Hines told him that Lawson wanted to kill him and, to prevent this from happening, Snow and Lawson had to fight. Snow testified that Hines then instructed him to stand against the wall with his hands behind him and Lawson came out of the shift office and punched him. Snow testified that Hines said, "Now, y'all are even," and officers Weathers and Hines broke up the fight.

---

[2] Bates 129, 146, 230, 231, 311, 349, 356, 364, 365, 366, 367, 368, 413, 447, 451, 453, 454, 456, 538, 549, 550, 551, 552, 590, 611, 612, 622, 648, 662, 663, 664, 665, 666, 675, 679, 680, 717, 718, 719, 729.

Snow testified that Weathers and Hines then walked over to the black top with Lawson and Snow, and Snow repeatedly asked Lawson not to fight him. Snow stated that Lawson dropped his head, rushed him, swung at him, and then went under him and picked him up, and that Snow came down on his right shoulder and injured it. Snow said he had Lawson in a headlock and repeatedly asked him to stop. He said that it took about 30 seconds for officers Weathers and Hines to intercede and stop the fight.

According to Snow, after he showed Weathers and Hines his shoulder, Hines tried to put it back in place, but was unsuccessful. Snow asked to go to the infirmary. Snow claims that Hines asked him to sign a statement that he fell out of bed, but Snow refused. Hines then escorted him to the healthcare unit. Snow testified on cross-examination that he did not tell the examining nurse, Kelly Rice, about the fight because Hines is the one who explained what had happened. He said that the words reported on the medical form, which purport to be his own—"I fell backwards on the floor and landed on my RT shoulder"—actually were related by Hines. (Ex. 3, Bates 688). Snow claimed that he was prevented from reporting the fight because Hines was standing beside him.

Snow also testified that late at night on January 11th an unidentified black male "stomped" him on the shoulder while he was in bed and said, "Sign the statement," which he understood to be the same statement that he said Hines asked him to sign. The next morning, Snow went to see Captain Howard and reported to her the incidents of January 5th and 11th, relating that Hines "forced me to fight Patrick Lawson." At Snow's request, Howard put him in lock-up for his protection. Snow also denied that he had ever used drugs in prison as Lawson's statement alleged. (Ex.7, Bates 692).

On cross-examination, Snow confirmed that he was transferred from the healthcare unit at Staton to Elmore County Hospital emergency room in the early morning hours of January 5, 2017,

4

where he was examined and x-rays were taken; the latter showed a mild AC joint separation. (Ex. 10, Bates 665). He was discharged about 5:00 a.m. He denied that he said to medical personnel at Elmore County that he fell "off bunk" or "off bed" as reported in his medical documents. (Ex. 10, Bates 662, 665).

Snow also testified that he slept on a bottom bunk. He pointed to his ADOC movement history form (Ex. 13, Bates 700) as evidence of his bottom bunk assignment and proof that he could not have jumped from a top bunk and injured his shoulder as Hines' incident report suggested (Ex. 1; Bates 686). However, Hines testified that Snow told him he had injured his shoulder in the dorm before the confrontation with Lawson. Hines also signed a statement to that effect. (Ex. 12, Bates 698). Captain Howard also testified that Snow told her on January 11th that he had hurt his shoulder by falling off the bed. Furthermore, a fellow inmate, Willie Robinson, gave a statement on January 5, 2017 that he "observe[d] Snow getting up from the floor he stated that he was getting his towel when he fell from his bed and he said his shoulder was hurting. I told him to go to the shift office and tell the police." (Ex. 4, Bates 689).[3] On the other hand, during his testimony as part of Snow's case, Robinson said that he gave this statement to protect himself and recanted it. Rather, he testified that he saw Snow on January 5th after chow (which began about 3:00 a.m. and ended about 6:00 a.m.), and Snow told him his shoulder was injured "by the goon squad."

Defendant Hines testified that on the black top on January 5th, Lawson grabbed Snow, the two men fell, and he and Weathers immediately separated them. Hines denied that he forced Lawson and Snow to fight and denied that he attempted to coerce Snow into saying he fell off the bed or had anything to do with the alleged stomping on January 11th. He also testified that he was not concerned that Snow and Lawson would fight when he called them to the shift office because

---

[3] Similarly, fellow inmate John Hunter's January 5, 2017 statement says, "I, John Hunter saw Snow on the ground B side the bead trying to get his towel up. Sgt. Jones was doing walk throu getting clothes lines down." (Ex. 5, Bates 690).

5

earlier that night they had only argued verbally. Hines also testified that the inmate statement on the body chart created by Nurse Rice at the infirmary was given to Rice by Snow, and that Hines did not speak for him. Finally, Hines said that after escorting Snow to the infirmary, he took statements from inmates Robinson and Hunter and retrieved personal items from Snow's bed. He said that Snow directed him to a top bunk bed where he found personal items with Snow's AIS number.

Defendant Weathers testified that he reported Snow's and Lawson's January 5th verbal argument to Lt. Hines. Then, at Hines' direction, he took Lawson to the shift office and went back and got Snow. He said Lawson and Snow were outside the shift office on the black top when they "charged each other" and he and Hines separated them. Weathers denied picking Snow up so he could fight Lawson, and testified that, to his knowledge, Hines did not make the inmates fight.

Captain Ronzella Howard, who has been employed by the DOC since 1993 and has been a captain since 2011, testified that Snow approached her on January 11th and told her that Hines made Lawson and Snow fight, and that an unidentified inmate stomped on Snow's shoulder while he was in bed late on the night of January 10th or early on the morning of the 11th. She said that Snow also told her that he had injured his shoulder by falling off the bed. She testified that it is customary for an investigation to be performed when an inmate reports an injury, whether by accident or otherwise. In this instance, she interviewed Lawson, Snow, Hines, and Weathers and concluded that there was "no validity" to Snow's claims that Hines made Lawson and Snow fight. She also testified that Snow never told her that he suspected Hines was involved in the stomping or that Hines pressured him to say that he fell off the bed and injured his shoulder. Also, she mentioned Lawson's statement that Snow was "in debt for his drug abuse" (Ex.7, Bates 692) and testified that, in her experience, retaliation is common between inmates when money is owed. She also said that it is common for inmates to sleep in beds which are not assigned to them. Finally,

6

she testified that it was her decision to put Snow in a holding cell since he had been assaulted the night before.

Nurse Kelly Rice, who is currently the director of nursing for Staton and other prisons, has been a registered nurse for 32 years and has worked with the prison system for 13 years. On January 5, 2017, she was the medical supervisor of the healthcare unit. Rice testified that when Snow arrived to the healthcare unit, she examined him, filled out the body chart (Ex. 3, Bates 688), and wrote down Snow's own words explaining the injury. She stated that Snow told her, "I fell backwards on to floor and landed on my RT shoulder." (Ex. 3, Bates 688). On the chart, Rice noted "obvious displacement" of the right shoulder and "bruising … to top of RT clavical bone," as well as a "[s]mall cut to RT F/A underneath. No other injuries seen to head, face, chest, legs, LT arm, or back." (Ex. 3, Bates 688). Rice also filled out a "Nursing Encounter Tool," where she wrote, under the heading, "Subjective," that Snow's "Chief Complaint" was that he "slipped & fell onto concrete floor landing on RT shoulder." (Ex. 10, Bates 718).[4] Rice testified that this description came from Snow. Rice also described Snow's injury on the same document as "fall onto floor." (Ex. 10, Bates 718). In addition, Rice testified that when she filled out an emergency department referral form for Snow, she wrote, "He fell on floor - slipped & landed on his RT shoulder - causing it to pop out of place … ." (Ex. 10, Bates 465). Further, Rice said that the Emergency Physician Record from the Elmore Community Hospital, filled out by a different provider, reports that Snow "Fell off bunk," and that the box entitled "Context," includes a check mark also indicating "fell," with the written comment, "off bed." The "patient" was listed as the "historian" on these records. (Ex. 10, Bates 662). Rice said that Snow never told her that his injuries resulted from a fight with another inmate, and she said that part of her duties in examining an injured inmate include a

---

[4] She explained that Nurse Arrington began the paperwork on Snow, but came and got her when she saw his shoulder. Ultimately, Arrington signed the documents, but Rice filled out the documents and the handwriting is hers.

7

determination of whether the injuries resulted from an "altercation or an accident." She said that she saw nothing in her examination of Snow that would have indicated that there was an altercation, as she did not see bruising or scraping on his face, hands, elbows, or knees. On cross examination, Snow asked Rice to review photographs taken of him on January 5, 2017, following the fight (Ex. 8, Bates 693, 694 and 695), but Rice said that the photos were not clear and she saw nothing in them which would change her testimony concerning the injuries that she recorded after examining Snow.

Doctor Michael Borowicz, a non-examining physician, testified based upon the record medical evidence that the January 5, 2017, ER x-rays showed that Snow had suffered a "mild" AC separation. (Ex. 10, Bates 665). Dr. Borowicz said that this type of injury would typically heal on its own without surgery. Dr. Borowicz testified that a second x-ray on January 11th showed that Snow had sustained a more severe "grade 3" injury to shoulder. (Ex. 10, Bates 717, 147). Dr. Borowicz said that typically surgery is needed for a full recovery from this type of injury. He also testified that the early morning January 11th "stomping" alleged by plaintiff could have led to this more severe injury. Dr. Borowicz said that Dr. Powell performed surgery on plaintiff's shoulder on March 21, 2017, but the progress notes showed that Snow was "noncompliant" because he failed to wear his sling consistently. Further, Dr. Borowicz testified that Dr. Powell's notes of April 18, 2017 (Ex. 10, Bates 679-680) indicated that the plaintiff had suffered a more traumatic injury to his right shoulder at this point and this caused a gross disruption in healing. Snow confirmed that he fell and reinjured his shoulder prior to April 18, 2017.

### III. DISCUSSION

#### A. *Excessive Force Standard*

Claims of excessive force by prison officials against convicted inmates are governed by the Eighth Amendment's proscription against cruel and unusual punishment. *Campbell v. Sikes*,

169 F.3d 1353, 1374 (11th Cir. 1999). The standard applied to an Eighth Amendment excessive force claim contains both a subjective and objective component. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The subjective component requires that prison "officials act[ed] with a sufficiently culpable state of mind." *Hudson*, 503 U.S. at 8 (internal quotations omitted). With respect to the objective component, a plaintiff must show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id*. In addition, "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Id*. at 4.

> Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.1973)); *see also Hudson v. McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, at 7-8, 112 S.Ct. 995; *see also Whitley*, 475 U.S. at 321, 106 S.Ct. 1078; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir.1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321, 106 S.Ct. 1078 (quoting *Johnson*, 481 F.2d at 1033).

*Skrtich v. Thornton*, 280 F.3d 1295, 1300-1301 (11th Cir. 2002). "Moreover, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Id*. at 1301.

In *Hudson*, the court held that the use of excessive physical force against a prisoner may constitute cruel and unusual punishment even though the prisoner does not suffer serious injuries. 503 U.S. at 9. Whether a defendant's use of force is excessive, and thus violates an inmate's right to be free from cruel and unusual punishment, "depends on whether the [defendant's] act 'shocks

9

the conscience,' *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007), and it necessarily will if the force "'was applied . . . maliciously and sadistically for the very purpose of causing harm.'" *Whitley v. Albers*, 475 U.S. 312, 320-321 (1986). An excessive force claim "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327); *Brooks v. Kyler*, 204 F.3d 102, 103 (3rd Cir. 2000) (holding there is "no fixed minimum quantity of injury that a prisoner must prove that he suffered" in order to present an excessive force claim).

Notwithstanding that a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in serious injury. *Hudson*, 503 U.S. at 8. Rather, the key inquiry under *Hudson* is whether the alleged conduct involved "unnecessary and wanton infliction of pain." *Id*. While the Supreme Court recently emphasized that its holding in *Hudson* did not stand for the proposition that a "certain quantum of injury [needed to be] sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm,'" the court further noted that to require a showing of significant injury "would permit any physical punishment, no matter how diabolic or inhuman," absent some quantum of injury. *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S.Ct. 1175, 1178 (2010) (quoting *Hudson*, 503 U.S. at 7, 9).

Courts have recognized that excessive force claims which allege that prison guards incited one inmate to assault another are actionable under the Eighth Amendment. *See Randle v. Alexander*, 960 F.Supp.2d 457, 473 (S.D.N.Y. 2013) (citing *Northington v. Jackson,* 973 F.2d 1518, 1525 (10th Cir.1992) (holding that a complaint alleging that prison guards incited other inmates to beat the plaintiff stated a cognizable excessive force claim, because "[w]hen an inmate is able to prove such intent, it is as if the guard himself inflicted the beating as punishment"); *cf.*

*McGill v. Duckworth,* 944 F.2d 344, 347 (7th Cir.1991), *overruled in part on other grounds by Farmer,* 511 U.S. at 825, 114 S.Ct. 1970 (noting, in the failure to protect context, "[i]f prison officials put McGill into the IDU so that a bigger inmate would have a better chance to rape him, then it is as if the officials inflicted that pain and humiliation themselves")).

### B. Failure to Protect

To succeed on his Eighth Amendment claim that officers Hines and Weathers failed to protect him from the attack by Lawson on the black top, Snow must first demonstrate that an objectively substantial risk of serious harm existed to him and "that the defendants disregarded that known risk by failing to respond to it in an objectively reasonable manner." *Johnson v. Boyd*, 568 F. App'x 719, 721 (11th Cir. 2014), citing *Caldwell v. Warden*, 748 F.3d 1090, 1100 (11th Cir. 2014). Further, Snow must show "that [each] defendant subjectively knew that [he] faced a substantial risk of serious harm. The defendant must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. (internal citation omitted).

> In determining subjective knowledge, a court is to inquire whether the defendant-official was aware of a "particular threat or fear *felt by [the] [p]laintiff*." *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir.2003) (emphasis added). Moreover, the defendant-official "must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists — and the prison official must also draw that inference." *Id*. at 1349 (quotations omitted).

*Johnston v. Crosby*, 135 F. Appx 375, 377 (11th Cir. 2005) (emphasis in original).

"At bottom, prison officials may not abuse prisoners directly, nor may they indirectly subject prisoners to harm by facilitating abuse at the hands of prisoners' fellow inmates." *Christian v. Saunders*, 2018 WL 3300695, at *7 (S.D.N.Y. 2018) (citing *Randle*, 960 F.Supp.2d at 471).

### C. Analysis

11

It is undisputed that on January 5, 2017, Lawson attacked Snow on the black top outside the shift office following a verbal confrontation between the two inmates in the dorm.[5] Defendant Hines disputes Snow's testimony that he forced Lawson and Snow to fight. Defendant Weathers also testified that, to his knowledge, Hines did not make the inmates fight. Rather, both Hines and Weathers stated that after Lawson charged Snow, the two of them fell, and the defendants immediately interceded and separated them. They further dispute Snow's claim that his shoulder was injured in the attack by Lawson. Instead, Hines testified that Snow told him he had hurt it previously in the dorm. Hines also denied that he had any knowledge of or involvement with an unidentified inmate's "stomping" on Snow's shoulder in the late night hours of January 10th or the early morning hours of January 11th. He further denies that he asked Snow to say that he injured his shoulder by falling from a bed. Also, Hines testified that he had no knowledge that Lawson and Snow would fight because their prior conflict in the dorm was only verbal. After listening to each of the witnesses and duly considering all of the evidence, the court finds that the testimony provided by Snow with respect to the disputed events is undermined by the medical evidence and the testimony of other witnesses. On the other hand, the court finds the testimony of the defendants to be generally consistent with the testimony of other witnesses and the medical evidence.

In reaching this conclusion, the court is aware of the rule in the Eleventh Circuit that a credibility determination cannot be based solely on the "status" of a witness. Rather, the court must weigh the testimonies of all the witnesses, taking into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand. *Gallage v. United States*, 174 F.3d 1196, 1198 (11th Cir. 1999). Snow was a persuasive witness, and the court found his testimony to be plausible considered alone, but the court is also mindful of Snow's

---

[5] Snow and Lawson signed a Living Agreement on January 5, 2017, after counseling with Lt. Hines. (Ex. 9, Bates 696).

obvious interest in receiving a favorable judgment. After careful consideration of the testimony and documentary evidence, the court is persuaded that the testimony of Nurse Rice and Captain Howard, both of whom are not parties to this action and whose testimony was not successfully impeached, undermines Snow's testimony and is generally consistent with the testimony of the defendant officers.

Nurse Rice examined Snow immediately following the allegedly forced fight and recorded her observations in a body chart and other medical documents. (Ex. 3, Bates 688; Ex. 10, Bates 718). Snow's allegations regarding the nature and extent of the fight—his complaint alleges that Lawson punched him in the face, slammed him to the ground, hit him several times, and then slammed him to the ground again, injuring his shoulder (Doc. 1 at 4-5)—are inconsistent with the findings made by Rice during the medical examination. She testified that had Snow been in an altercation as he claimed, she would have expected to see additional injuries like scrapes to his hands and knees. Further, she said that it is part of her job to determine whether an inmate's injuries resulted from an "accident or an altercation." On cross-examination, Snow showed her pictures taken of him on January 5th (Ex. 8, Bates 693-695), but Rice testified that those pictures did nothing to change her testimony. Importantly, Rice's testimony also specifically discredits Snow's testimony that Hines spoke for him in relating what occurred on January 5th. Rather, Rice testified that Snow himself told her, "I fell backwards on the floor and landed on my RT shoulder," when she was filling out his body chart. (Ex. 3, Bates 688). Likewise, Rice said that the chief complaint that she noted in the Nursing Encounter Tool—"slipped & fell onto concrete floor landing on RT shoulder"—also came from Snow. She also testified that Snow was the source of the notations on the ER documents in the box entitled "Context," which included a check mark indicating "fell" and the handwritten note, "off bed," based on the fact that the patient was listed as the historian. (Ex. 10, Bates 662).

Captain Howard, who likewise is not a party, confirmed that Snow reported the January 5th and 11th incidents to her. She testified that Snow never told her that he suspected Hines was involved in the "stomping" or that Hines had pressured him to say that he was injured by falling off a bed. She also said that Snow told her that he had hurt his shoulder by falling off the bed. Following her investigation and interviews with Lawson, Snow, Hines and Weathers, Howard concluded that there was "no validity" to Snow's allegations that Hines made Lawson and Snow fight. She testified that Lawson told her that Snow owed money to other inmates and that, in her experience, retaliation against inmates who are in debt is common.

No evidence—testimonial or documentary—corroborates Snow's account of his being forced to fight Lawson. Nor is there evidence that the physical altercation which occurred between Lawson and Snow on January 5th was as extensive as Snow claims. Specifically, the medical examinations conducted within a short time after the fight demonstrated that Snow did not suffer additional injuries that might have been expected based on his description of the altercation, and also the results of those examinations are not inconsistent with Snow's own report that he had previously injured his shoulder in a fall. Thus, the court does not find credible the allegations by Snow that defendants Hines and Weathers acted sadistically and maliciously to cause harm by making him fight inmate Lawson or that they failed to protect Snow from Lawson's attack by ignoring an obvious threat to his safety. Instead, the credible evidence demonstrates that immediately after Lawson charged Snow and they both fell, Hines and Weathers interceded and separated the two.

## IV. CONCLUSION

In sum, the court concludes that Snow has not met his burden to establish any constitutionally impermissible actions by defendants. Consequently, judgment is due to be granted in favor of the defendants.

Accordingly, based on the evidentiary record, it is the RECOMMENDATION of the Magistrate Judge that:

1. Judgment be entered in favor of the defendants and against the plaintiff.

2. This case be DISMISSED with prejudice.

3. Costs be taxed against the plaintiff, for which execution my issue.

It is further

ORDERED that on or before March 25, 2021, the parties may file objections to the Recommendation. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE, on this the 11th day of March, 2021.

/s/ Susan Russ Walker  
Susan Russ Walker  
United States Magistrate Judge